SEYMOUR LITTMAN, INDIVIDUALLY AND AS MAYOR OF THE TOWNSHIP OF MILLSTONE AND THE TOWNSHIP OF MILL-STONE, PLAINTIFFS, AND DIANAMIC INDUSTRIES AND COBBLESTONE PENN LIMITED PARTNERSHIP, PLAIN-TIFFS-APPELLANTS, v. RICHARD GIMELLO, EXECUTIVE DI-RECTOR AND THE HAZARDOUS WASTE FACILITIES SITING COMMISSION, DEFENDANTS-RESPONDENTS.

THE TOWNSHIP OF EAST GREENWICH, A MUNICIPAL CORPO-RATION OF THE STATE OF NEW JERSEY, CARL A. BRES-SLER, WALTER P. GEORGE, HARGREEN ASSOCIATES, MIL-TON S. DUNN, FREDERICK WAIBEL, ADELBERT THOMP-SON, AND ANNA PENNELL, PLAINTIFFS, v. THE HAZARD-OUS WASTE FACILITIES SITING COMMISSION AND RICH-ARD GIMELLO, EXECUTIVE DIRECTOR, DEFENDANTS.

Argued January 30, 1989—Decided May 4, 1989.

*Michael A. Pane* argued the cause for appellants.

*John A. Covino* argued the cause for respondents (*Donald R. Belsole*, Acting Attorney General of New Jersey, attorney; *James J. Ciancia*, Assistant Attorney General, of counsel; *Francine A. Schott*, Deputy Attorney General, on the brief).

*Lewis G. Adler* submitted a letter in lieu of brief on behalf of *amicus curiae*, Gloucester County (*Hasbrouck & Uliase*, attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

Plaintiffs claim that the declaration of their property as a potential site for a hazardous-waste facility under the New Jersey Major Hazardous Waste Facilities Siting Act ("Act"), *N.J.S.A.* 13:1E–49 to –91, *L.*1981, *c.* 279, constitutes a taking of property without just compensation in violation of the United States and New Jersey Constitutions. We hold that it does not.

## I

The New Jersey Hazardous Waste Siting Commission ("Commission") was established pursuant to the Act to designate sites for hazardous waste storage, treatment, and disposal. In March 1985 the New Jersey Major Hazardous Waste Facilities Plan was formulated by the Commission. The plan anticipated that within three years the amount of hazardous waste requiring off-site treatment would exceed present capabilities by at least 167,000 tons. Therefore, it called for the construction of one or two rotary kiln incinerators and one land-storage facility.

The Commission is statutorily charged with the responsibility of locating appropriate sites for the future construction of hazardous waste facilities needed by the State of New Jersey. *N.J.S.A.* 13:1E–59. After the Commission identifies a potential facility site, that site is tested to determine if it conforms to the regulatory criteria enumerated in *N.J.S.A.* 13:1E–57 and *N.J. A.C.* 7:26–13.1 to –13.7. If a site does not meet the criteria, it is dropped from consideration. If the site satisfies the specifications, the Commission determines whether to propose the site for adoption. Once a site is proposed, a grant is made to the municipality so that a suitability study may be conducted. *N.J.S.A.* 13:1E–59(a)(1). This site-suitability study is to be completed in six months and the results transmitted to the Commission.

Within forty-five days after receipt of the study, an administrative hearing must be held to determine the appropriateness of the site. The administrative law judge makes a recommen-

dation concerning the site. Under *N.J.S.A.* 13:1E–59(a)(4), the administrative law judge cannot recommend a site unless there is "clear and convincing evidence" that it will not constitute a substantial detriment to public health, safety or welfare. Once the Commission receives this recommendation, it may accept or reject it and adopt or withdraw the site. This final action is subject to judicial review. *N.J.S.A.* 13:1E–59(a)(5).

Following adoption of the site, private firms will submit engineering designs for the facility. On approval of a design, the Commission will enter into negotiations for the purchase of the adopted site. If these negotiations fail, the Commission has the power to condemn the property. *N.J.S.A.* 13:1E–81.

## II

In February 1986, the Commission identified eleven potential facility sites. Seven of these sites were potential incinerator sites and four were possible land storage sites. At the start of this litigation, the Commission completed testing of two of the eleven sites,[1] both of which were determined to be unsatisfactory.

This appeal arises from two separate actions brought by affected landowners and municipal officials of two of the potential sites—East Greenwich and Millstone.[2] Both suits alleged that the Act constituted a "taking" of property without just compensation and due process in violation of the United States and New Jersey Constitutions. The plaintiffs also questioned

---

[1]The Commission's authority to enter the land for this preliminary testing was upheld by the Appellate Division in *Forbes v. New Jersey Hazardous Waste Facility Siting Commission,* Docket No. A–5090–85T6 (Oct. 16, 1986), certif. denied, 107 *N.J.* 65 (1986).

[2]Six lawsuits, including those brought by East Greenwich and Millstone, resulted from the Commission's identification of the 11 potential facility sites. Each was brought by the owners of the lands identified for testing, and/or the municipality in which the lands were located. In each the plaintiffs' claims were dismissed and judgment entered in the Commission's favor.

the authority of the Commission to enter their land to do the initial testing of the identified sites.

Plaintiffs made interlocutory applications to prevent the Commission from entering their property to test, but these requests were rejected by this Court on December 2, 1986.[3] Thereafter, the cases were consolidated, and plaintiffs moved for summary judgment on the issues of the Commission's authority to enter and test the site and whether the Act constituted a taking of property without just compensation or due process. The Commission cross-moved for dismissal of the complaints.

On January 7, 1987, the trial court, in an unpublished decision, granted defendant's motion for summary judgment and dismissed plaintiffs' complaints. It rejected their "taking" claim based on a long line of New Jersey cases, reasoning "that the mere plotting or planning in anticipation of a public improvement does not constitute a taking or damaging of the property affected." It also rejected the plaintiffs' claims that a dimunition in market value or loss of financing constitutes a compensable taking. Nonetheless, the trial court recognized that in very limited circumstances an extraordinary delay on the part of the governmental authority in determining whether the property is to be condemned may lead to a finding of inverse condemnation. Hence, the trial court dismissed plaintiffs' claims without prejudice to plaintiffs to institute another action alleging inverse condemnation.

The plaintiffs in the consolidated actions appealed. The Appellate Division affirmed the trial court's order granting defendants summary judgment and dismissing the complaints substantially for the reasons stated in the trial court's opinion.

---

[3]This testing was subsequently done, and the East Greenwich site was dropped from consideration. However, as of November 29, 1988, the Millstone site has been formally proposed and a grant now will be made to Millstone so it can conduct a suitability study.

The plaintiffs filed a petition for certification seeking review only of the lower courts' judgments that there had not been a compensable "taking" of their property. Specifically, they claim that the identification of their property as a potential site for a hazardous waste incinerator, combined with the time involved in the siting process, has created a "yellow cloud" that hangs over their property and has denied them all beneficial use of the land. We granted certification. 111 *N.J.* 639 (1988).

## III

Because we are "reviewing the dismissal of [plaintiffs'] claims as legally insufficient, we must accept as true all the allegations of the complaint, the affidavits and products of discovery submitted on [their] behalf. We must also draw those reasonable inferences that are most favorable to [their] cause." *Portee v. Jaffee,* 84 *N.J.* 88, 90 (1980).

There are two affected landowners involved in the instant case, Dianamic and Cobblestone–Penn. Dianamic owns a portion of the property in Millstone designated as a possible site. Specific harm caused to Dianamic by designation as a potential site is not explicitly alleged. Cobblestone–Penn owns property adjacent to a portion of the possible site, and this property may have to be condemned inasmuch as *N.J.S.A.* 13:1E–57 requires development of a "buffer zone" between the facility and certain land around it.

Prior to the identification of the site, Cobblestone–Penn was planning to develop a senior citizens mobile-home park on its property. This plan fell through following the identification of the property, and Cobblestone–Penn claims the Act has prevented it from using its property for its zoned purpose. It appears the financial backers for the trailer park became uneasy about the identification and withdrew financing, and Cobblestone–Penn could not find backing elsewhere. Also, Cobblestone–Penn takes the position that senior citizens' susceptibility to

respiratory ailments renders this property unsuitable for such a purpose.

Although neither landowner appears to be involved in substantial farming operations, both assert that the threat of condemnation has made it unfeasible for them to make initial investments necessary for a long-term, successful farming operation.

## IV

■ Both article I, paragraph 20 of the New Jersey Constitution and the fifth and fourteenth amendments to the United States Constitution prohibit the government from taking property without paying just compensation. The protections afforded under both constitutions are coextensive. *See Rieder v. State Dep't of Transp.*, 221 *N.J.Super.* 547, 553 (App.Div.1987).

The clearest example of a taking is a situation in which property is physically invaded. 2 *Nichols on Eminent Domain*, § 6.05 at 6–34 (J. Sackman ed. 1985). Traditionally, physical invasion was an indispensable element of a "taking" claim. Note, *A Proposal for Compensating Landowners for the Effects of Urban Redevelopment*, 5 *Wm. Mitchell L.Rev.* 165, 171 (1979). This requirement, however, began to erode, and "[i]t is generally held in New Jersey [and] elsewhere ... [that] in a few narrowly defined situations" compensation will be awarded for "noninvasive" governmental activity: namely, off-site activities that spill over onto the claimant's property; diminition in value flowing from governmental regulation; and diminution in value caused by pre-taking activities. Payne, *A Survey of New Jersey Eminent Domain Law*, 30 *Rutgers L.Rev.* 1111, 1188 (1977). This case involves the third type of claim (pre-condemnation activity).

■ Government plans ordinarily do not constitute invasion or taking of property. *Danforth v. United States*, 308 *U.S.* 271, 60 *S.Ct.* 231, 84 *L.Ed.* 240 (1939); *Wilson v. Long Branch*,

27 *N.J.* 360 *cert. den.*, 358 *U.S.* 873, 79 *S.Ct.* 113, 3 *L.Ed.*2d 104 (1958). "The mere plotting and planning in anticipation of condemnation without any actual physical appropriation or interference does not constitute a taking." *Kingston East Realty Co. v. State of N.J.*, 133 *N.J.Super.* 234, 239 (App.Div.1975); *accord Wilson v. Long Branch, supra,* 27 *N.J.* at 374 (no taking where there is a declaration that property is in blighted area); *Rieder v. State Dep't of Transp., supra,* 221 *N.J.Super.* at 555 (no taking upon the filing of a preservation alignment map by the Department of Transportation); *Schnack v. State,* 160 *N.J.Super.* 343, 349–50 (App.Div.) (same), *certif.* den., 78 *N.J.* 401 (1978); *Far–Gold Constr. Co. v. Chatham,* 141 *N.J.Super.* 164, 169 (App.Div.1976) (no taking where municipality's resolution expresses desire to acquire property for park as part of Green Acres program).

In contrast to a situation in which land has been physically-invaded, there is no precise formula that courts use to determine whether a compensable "noninvasive" taking has occurred. The issue depends on the facts of the case. In this case we find that none of the plaintiffs' allegations establishes that there has been a compensable taking at this time. The identification of the eleven potential sites and the attendant publicity did not prevent the landowners from using or developing their property. Nothing in the Act or regulations thereto poses a legal impediment to the use or development of plaintiffs' land. Cobblestone–Penn's property is zoned for low-density cluster housing. There is no allegation that some other type of housing, besides senior citizens' housing, could not be built on the property.

Cobblestone–Penn's allegation that it cannot build its senior citizens' trailer park because of a lack of financing does not rise to the level of a taking. Lost economic opportunities allegedly occasioned by pre-taking government activity do not constitute a compensable "taking" under either the United States or New

Jersey Constitutions. *Barsky v. City of Wilmington,* 578 *F.Supp.* 170, 173 (D.Del.1983) (absent unreasonable delay, difficulties in renting property caused by announcement of urban renewal plan not compensable); *Schoone v. Olsen,* 427 *F.Supp.* 724, 725 (E.D.Wis.1977) (same); *East Rutherford Indus. Park v. State,* 119 *N.J.Super.* 352, 361 (Law Div.1972) (inability to find lessees as a result of publicity surrounding proposed sports complex is *damnum absque injuria* ). The loss of financing also does not amount to a taking. *Windward Partners v. Ariyoshi,* 693 *F.*2d 928, 929 (9th Cir.1982), *cert. den.,* 461 *U.S.* 906, 103 *S.Ct.* 1877, 76 *L.Ed.*2d 809 (1983).

Plaintiffs' allegations concerning harm to potential farming operations are also comprised of nothing more than uncertainty caused by governmental planning and possible forgone economic opportunities. They can still use their land for farming and if it is eventually condemned, they will get a fair price for it. If it is not condemned, they can go on farming.

Likewise, we find the plaintiffs' contention that a compensable taking has occurred because the market value of their land has diminished as a result of publicity concerning the Millstone site equally unpersuasive. The cases are legion that hold that decreases in the value of property during governmental deliberations, absent extraordinary delay, are incidents of ownership and do not constitute a taking. As the Supreme Court stated: "[I]n the absence of an interference with an owner's legal rights to dispose of his land even a substantial reduction in the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth amendment." *Kirby Forest Indus. v. United States,* 467 *U.S.* 1, 15, 104 *S.Ct.* 2187, 2197, 81 *L.Ed.*2d 1, 14 (1984) (footnote omitted); *accord Agins v. Tiburon,* 447 *U.S.* 255, 263 n. 9, 100 *S.Ct.* 2138, 2143 n. 9, 65 *L.Ed.*2d 106, 113, n. 9 (1984); *Danforth v. United States, supra,* 308 *U.S.* at 271, 284–285, 60 *S.Ct.* at 231, 236, 84 *L.Ed.* at 246; *Frazier v. Lowndes County, Miss. Bd. of Educ.,* 710 *F.*2d 1097, 1100 (5th Cir.1983); *Wilson v. Long Branch, supra,* 27 *N.J.* at 374–75; *Jersey City Redevelopment Agency*

v. *Bancroft Realty Co.*, 117 *N.J.Super.* 418, 423 (App.Div.1971); *East Rutherford Indus. Park v. State, supra,* 119 *N.J.Super.* at 360–61.

Strong policy considerations underpin our holding that lost economic opportunities, forgone financing, and diminution in market value arising from government plans and their attendant publicity do not alone give rise to a compensable taking. "The public has an interest in keeping apprised of impending government action." *East Rutherford Indus. Park, supra,* 119 *N.J.Super.* at 361–62. The disposition of hazardous waste is a major concern of the State. The problem poses substantial health and economic threats to the citizenry. The public, therefore, has a strong interest in the activities of the Commission. To that end, the Legislature has provided in the Act that the Commission give notice of its proposed plans to the public and then conduct public hearings throughout the state. *N.J.S.A.* 13:1E–58.

## V

■ We have held, however, "that a compensable taking can occur when governmental action substantially destroys the beneficial use of private property." *Schiavone Constr. Co. v. Hackensack,* 98 *N.J.* 258 (1985); *Lomarch Corp. v. Mayor of Englewood,* 51 *N.J.* 108 (1968); *Morris County Land Improvement Co. v. Parsippany–Troy Hills,* 40 *N.J.* 539 (1963). Nonetheless, it is only when "the threat of condemnation has had such a substantial effect as to destroy the beneficial use that a landowner has made of his property, [that] there has been a taking of property within the meaning of the Constitution." *Washington Market Enterprises v. Trenton,* 68 *N.J.* 107, 122 (1975). We find no such threat in this case.

The instant case is easily distinguishable from those cases in which the government imposed a direct restraint on the use of the property, thereby depriving the owner of all beneficial use

of the land for a significant period of time. *See, e.g., Schiavone Constr. Co. v. Hackensack, supra,* 98 *N.J.* at 264 (Hackensack Meadowlands Development Corporation imposed a moratorium on real estate development that covered plaintiff's 115 acres of undeveloped land); *Lomarch Corp. v. Mayor of Englewood, supra,* 51 *N.J.* 108 (municipal ordinance imposed one year restriction on right to develop land while municipality decided whether to purchase property); *Morris County Land Improvement Co. v. Parsippany Troy–Hills, supra,* 40 *N.J.* at 539 (zoning ordinance actually restricted use of swampland owned by plaintiff).

Plaintiffs' argument that their case is similar to the situation the plaintiffs faced in *Washington Market Enterprises v. Trenton, supra,* 68 *N.J.* 107, is unpersuasive. We recognize that the plaintiffs have, to some extent, been placed in an unpleasant state of limbo as a result of the declaration and proposal of their land as a potential site. Their ability to make substantial investments has been curtailed. Realistically no one will invest in their property while there is still a risk that it will be condemned. Nonetheless, a comparison of the extreme facts in *Washington Market* and those presented in the instant case clearly discloses that at this time plaintiffs have failed to establish that the beneficial use of their property has been destroyed by its selection as a potential hazardous waste site.

In *Washington Market,* the facts were as follows. In the late 1950s Trenton undertook a feasibility study for redevelopment. The plan included construction of a mall, which would require condemnation of the plaintiff's property on which a commercial building was situated. Redevelopment began in 1963 just south of the planned mall area. In 1964 a hearing was held to discuss the prospect of declaring the mall area "blighted." No action was taken until 1967, when another meeting was held and the area declared blighted. Frequent reports of the redevelopment plans were released by city officials.

Trenton gradually began to acquire property in the target area. By 1970 half of the necessary land had been acquired. In May 1973 Trenton altered its redevelopment priorities and informed plaintiff and other remaining property owners that their lands would no longer be taken. This protracted process wreaked havoc on the plaintiff. Its tenants began moving out in 1963. It had difficulties finding long-term tenants. By 1972 the building was, for the most part, vacant. Its yearly income from the land fell from $160,000 in 1963 to $6,300 in 1973. The surrounding area had greatly deteriorated. The practical effect of the city's ten-year course of action (and inaction) had been to leave the plaintiff with a worthless, useless, vacant building situated in a totally-devastated area. Moreover, Trenton abandoned the one plan that would have provided the owner with compensation, namely, its plan to condemn.

Unlike the plaintiff in *Washington Market*, the plaintiffs in the instant case are still able to make beneficial use of their property. At the time they initiated their action, they were free to use their land as they chose. No actual restriction was imposed on their rights to use their property. Indeed, there was a possibility that the Millstone site would not be selected. At the time they instituted their actions, there was, then, no "actual or threatened interference with the use of the property of such a permanent, serious or continuing nature to justify the conclusion that a 'taking' had occurred." *Kingston, supra*, 133 *N.J.Super.* at 240.

Moreover, plaintiffs make no specific allegations of deterioration of the surrounding area. As the court in *Schnack v. State, supra*, pointed out, "the holding in *Washington Market* clearly contemplates a reduction in value to 'near zero'...." 160 *N.J.Super.* at 350. There is no allegation that plaintiffs have lost their property or that they are threatened with losing their property. There is no evidence that if the hazardous-waste project does not go through, the permanent value of their property will nevertheless be diminished. They will be left in a fine position to develop their land. On the other hand, if it

does go through, they will receive compensation for their property—a possibility not open to the plaintiff in *Washington Market*. Most importantly, the plaintiff in *Washington Market* was threatened with condemnation for a substantial period of time—ten years. The plaintiffs here have not had a "yellow cloud" over their land for nearly that long.

## VI

■ Several factors must be considered and balanced in deciding whether a compensable-taking claim flowing from pre-condemnation activity has been established. First and foremost, extraordinary delay or other unreasonable conduct on the part of the condemning authority may give rise to a taking claim. *See Agins v. Tiburon, supra,* 447 *U.S.* at 263 n. 9, 100 *S.Ct.* at 2143 n. 9, 65 *L.Ed.*2d at 113 n. 9; *Barsky v. Wilmington, supra,* 578 *F.Supp.* at 173; *Kingston E. Realty Co. v. State of N.J., supra,* 133 *N.J.Super.* at 240; *A Survey of New Jersey Eminent Domain Law, supra,* 30 *Rutgers L.Rev.* at 1222; *Compensation for Landowners, supra,* 5 *Wm. Mitchell L.Rev.* at 200–02; *see also Lyons v. City of Camden,* 52 *N.J.* 89, 99 (1968) (condemning authority must act with "reasonable dispatch"); *Freeman v. Paterson Redevelopment Agency,* 128 *N.J.Super.* 448, 459 (Law Div.1974) (unreasonable delay relevant to award of interest after taking), *rev'd on other grounds,* 138 *N.J.Super.* 539 (App.Div.1978); *East Rutherford Indus. Park v. State, supra,* 119 *N.J.Super.* at 363 (action of condemning authority must clearly be expeditious).

In addition, the imminence of condemnation may also help to establish a taking claim. *A Survey of New Jersey Eminent Domain Law, supra,* 30 *Rutgers L.Rev.* at 1222. A property owner is more inclined to take or refrain from taking action in such circumstances. *Compensation for Landowners, supra,* 5 *Wm. Mitchell L.Rev.* at 197–98. As discussed, the severity of the injury and hardship to the property owner is yet another

factor to be considered. *Washington Market, supra,* 68 *N.J.* at 122; *A Survey of New Jersey Eminent Domain Law, supra,* 30 *Rutgers L.Rev.* at 1222.

All of the above factors are to be explored and weighed in conjunction with the public interest. Just as the public has an interest in keeping apprised of crucial government activities, so too it benefits from the cautious, deliberate administration of programs, such as hazardous waste disposal plans, that place encumbrances on private property.

Application of this balancing test in the instant case mandates the granting of summary judgment against the plaintiffs. They have made no showing of unreasonable conduct or extraordinary delay on the part of the Commission. Indeed, the Commission has already formally proposed the Millstone site and rejected the East Greenwich site. Further, at the time this matter was before the trial court the Commission had already rejected two other potential sites. Condemnation was hardly imminent when plaintiffs' action was brought, since they were —and still are—only part of a larger group of property owners whose lands are subject to consideration. Also, as shown, they fail to allege injuries comparable to those suffered by the plaintiff in *Washington Market.*

Essentially, plaintiffs claim a present taking based on conjecture about future facts. They contend that the procedures under the Act provide for an excessive period of delay of between forty-one to 101 months from the time of the identification of a potential site to its eventual condemnation. As the trial court correctly held, however, the question is whether the Commission's actions to date constitute a taking. The procedures under the Act on their face are not unreasonable. We decline to speculate about whether in practice their implementation will result in delays that are so excessive as to constitute a taking.

It is unwise and unnecessary to deal with such speculative and hypothetical questions. We find no evidence in the record

that the government is unduly delaying the processes. If the property is ultimately condemned, damages, if any, will be properly ascertained at that point. If the property is not condemned and no decision is made concerning condemnation for an excessively long period of time, then plaintiffs can renew their inverse condemnation claims. At this time plaintiffs have failed to establish that the beneficial use of their property has been destroyed by the Commission's actions.

Accordingly, the judgment of the Appellate Division is affirmed.

*For affirmance* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*For reversal* —None.